**EAST TEXAS MOTOR FREIGHT LINES v. W. H. HUTCHINSON & SON, Inc.**

No. 4595.

Court of Civil Appeals of Texas. Beaumont.
Oct. 6, 1949.

Rehearing Denied March 29, 1951.

Second Petition for Rehearing Denied
July 11, 1951.

760

Callaway & Reed, Dallas, for appellant.
Collins, Garrison, Renfro & Zeleskey, Lufkin, for appellee.

WALKER, Justice.

This opinion is rendered on a motion for rehearing by appellee, plaintiff in the trial court. On the original hearing of this cause, this court reversed the judgment of the trial court and remanded the cause for a new trial. We adhere to our judgment, and the plaintiffs' motion for rehearing is overruled. However, we are not satisfied with the form of our original opinion and with some of the expressions made therein, and we have also determined to adjudicate the points of error which we did not consider. The opinion now on file is therefore withdrawn and the following opinion is substituted therefor.

\* \* \* \* \* \*

This action was brought under Section 20(11) of Title 49 U.S.C.A., by the seller, and consignor, of certain goods, to wit, 4,100 gross of bottle caps, against the sole carrier of said goods, to recover damages for injury which the goods sustained while in the carrier's possession. Plaintiff consignor is appellee W. H. Hutchinson & Son, Inc. Defendant carrier is appellant East Texas Motor Freight Lines, which operates as an interstate motor carrier.

The cause was tried to the court sitting without a jury, and the trial court rendered judgment in behalf of plaintiff consignor against defendant carrier for the full value of the bottle caps, to wit, $717.60. From this judgment defendant carrier has appealed.

Defendant has filed four Points of Error for reversal.

Point One reads as follows: "The error of the court in rendering judgment against appellant for the value of 4,100 gross of the bottle caps, because appellee failed to prove that it was the lawful holder of the shipping contract or bill of lading on which the shipment moved, or that appellee was the owner of such merchandise at the time the suit was brought. On the contrary, the evidence shows that title to the merchandise passed to the consignee, Lufkin Coca-Cola Bottling Company, for it accepted delivery and proceeded to exercise the incidents of ownership by opening one or two containers and dumping and destroying the caps, there being no evidence whatever as to how

or when appellee reacquired title thereto, if it did."

The trial court made the following findings of fact which are relevant here:

"(1) Defendant, East Texas Motor Freight Lines, Inc., is a common carrier of freight, operating trucks in interstate commerce from Chicago, Illinois, to Lufkin, Texas, and other points.

"(2) On April 2, 1947, Plaintiff delivered 4100 gross of bottle crowns at Chicago, Illinois, for shipment to the Lufkin Coca Cola Bottling Company at Lufkin, Texas, paying the defendant the lawful freight thereon as charged by defendant.

"(3) Upon delivery of the 4100 gross of bottle caps or crowns by plaintiff to defendant, defendant issued a bill of lading to plaintiff and the defendant contracted to safely transport and safely deliver said bottle caps or crowns from Chicago, Illinois, to Lufkin, Texas.

"(4) At the time of delivery of said bottle crowns or caps to defendant they were newly manufactured, in good and undamaged condition, and free from all defects of any kind or character.

"(5) At the time of delivery of said bottle caps or crowns they were packaged in good secure containers free from all defects.

"(6) When the 4100 gross of bottle caps or crowns arrived at their destination at Lufkin, Texas, they were eaten, corroded or otherwise damaged to such an extent as to render them wholly unfit for their intended use."

A statement of facts has also been filed. This shows that only three witnesses testified, each called to the stand by plaintiff. The following evidence is relevant to the issues under discussion, is not inconsistent with the trial court's findings (except as it shows the delivery of 5,000 gross of bottle caps to defendant instead of only 4,100 gross of caps), and the evidence does not support any implied finding in conflict with this evidence now to be stated.

The plaintiffs' factory, in which the bottle caps were manufactured, was located at Chicago, Illinois where the caps were delivered to the defendant.

The caps were packed in wooden barrels, which were bound by steel hoops. Each barrel contained 100 gross of caps; so 5,000 gross of caps were contained in 50 barrels and 4100 gross were contained in 41 barrels.

W. H. Newsome, the owner and operator of the Lufkin Coca Cola Bottling Company referred to in the trial court's findings, testified that he had been engaged in the business of bottling Coca Cola for 37 years, and he expressed the belief that he had been purchasing bottle caps from plaintiff during a period of 30 years. He testified further:

"Q. In the course of thirty years you have bought many caps from time to time? From them? A. That's right.

"Q. Ever receive a shipment before that was damaged? A. No.

"Q. Have you bought caps since this shipment? A. Yes.

"Q. Received since then any that were damaged? A. No.

"Q. This is the only time over thirty years you have received a shipment with them damaged? A. Yes."

He testified further that on or about April 2, 1947, he placed an order with plaintiff for bottle caps; he ordered 5,000 gross;

"Q. What did you agree to pay for them? A. $.17½¢ per gross except the freight." He received that shipment from plaintiff.

"Q. Sometime after April 2, 1947? A. Usually takes a week."

His testimony shows that when these caps were delivered to him, the defendant took a receipt from an employee of his, which was referred to in the proof as "freight bill No. 417975."

He testified further that the caps were ordered for future use by him in his bottling plant. His testimony shows that when he received the caps, the barrels containing the caps appeared to be in good condition, except that the steel hoops around the barrels had begun to rust, and his testimony shows that all of these caps, in their containers, were stored by him on the second floor of his building where they

remained until he needed them for use in his bottling operations. The evidence does not show how long the caps remained in storage. He testified: "We use what we have already open before we go into the next shipment, but the government only let me have 5,000 gross at one time." He testified further that he opened a barrel of these caps "when we got to them. We used the ones we had up." He testified further:

"Q. Did you receive this shipment in the ordinary course of your business and immediately store them up there to await need for use? A. Yes.

"Q. When you had occasion to use them you opened them? A. Yes. I opened some and found them damaged."

As stated, he eventually opened a barrel of the caps and perhaps other barrels; he testified:

"Q. Do you know how many you opened? A. No; maybe one or two or three or four. Didn't take a chance." He said: "one would have been enough." He found the caps to be "damp and rusty" in the barrels he opened and he apparently put the entire shipment aside, in another place on his premises, and notified the defendant's salesmen of what he had found. This salesman and the foreman of Mr. Newsome's plant then examined the entire shipment, and Mr. Newsome testified that after this examination was made he "dumped" the caps. He said that he did not use any of them.

Lawrence I. Rosene, the defendant's sales manager, testified that on April 2, 1947 the plaintiff delivered certain bottle caps to the defendant for shipment to Lufkin, Texas, and that the Lufkin Coca Cola Bottling Company agreed to pay $875 for the caps. This testimony accords with that of Mr. Newsome.

Some of the caps, whether before or after Mr. Newsome "dumped" the caps is not shown, were sent to the plaintiff at Chicago and were examined there by a chemist whom the plaintiff employed. This chemist reported that the caps were of no value and that the cause of the damage was corrosion by hydrochloric acid.

Because of the subject matter of Point One, it is also necessary to mention some things which were not proved or which were proved only in part.

First, the evidence does not show the nature or terms of the bill of lading. In our original opinion, we construed the circumstances as showing that this bill was a straight bill of lading, but we have concluded that this finding was wrong and that the proof does not show what kind of a bill was issued to the plaintiffs by the defendant. Nor, except as this may be inferred, from the findings and evidence stated above, does the proof show how this bill was dealt with and handled after the plaintiffs received it. Second, the terms of the contract of sale and the manner and extent to which these terms were performed by the parties to this contract, were proved only so far as appears from the findings and the evidence hereinbefore stated. Third, the proof does not show whether any agreement, by way of rescission, indemnity or otherwise, had been made by the plaintiffs and the purchaser of the caps after the original contract of sale was made between these two parties.

We think that from the findings and the evidence stated and from the fact that the purchaser of the bottle caps testified at the plaintiffs' request it should be inferred that the purchaser is willing for the plaintiffs to prosecute this suit.

Point One attacks the sufficiency of the proof to show that the plaintiffs have a right to maintain this suit, and to the extent hereinafter indicated, and for the reasons hereinafter stated, we sustain Point One.

The bottle caps having been received by defendant carrier for interstate transportation, Sec. 319 of Title 49 U.S.C.A. makes the provisions of Sec. 20(11) of Title 49 applicable to the parties, to the contract of affreightment, and to the performance of the contract.

It is first provided in Sec. 20(11) that the carrier receiving the goods shall issue a bill of lading for the goods shipped, and next (quoting such words as apply here) that the carrier "shall be liable to the

lawful holder of said * * * bill of lading or to any party entitled to recover thereon * * * for the full actual loss, damage, or injury to such property caused by it". Plaintiff consignor, therefore, was bound to show by a preponderance of the evidence that when this action was brought said plaintiff was either the *lawful holder* of the bill of lading or else was *entitled to recover thereon,* that is, on the contract evidenced in part by the bill of lading.

The proof does not show that the plaintiff was the *holder of the bill of lading.* There is no affirmative proof of what happened to the bill after it was delivered to plaintiff, and if resort is had to inference, or "presumption", the only inference which is consistent with Mr. Newsome's testimony is that the bill was eventually delivered to him. We make this statement because the carrier had delivered the goods to Mr. Newsome, and this fact and Mr. Newsome's subsequent conduct shows that Mr. Newsome had become the owner of the caps, and in the ordinary course of events he would have acquired the bill of lading too. On such evidence, there appears to be no reason why the seller should keep the bill and there is a reason why the purchaser should have it, because it is evidence of the purchaser's title. Therefore, if any inference is to be made as to what happened to the bill of lading after the plaintiff got it from the defendant, the inference would have to be one that Mr. Newsome received the bill of lading from the plaintiff; but this is as far as inference can go. We cannot infer, without additional evidence, that Mr. Newsome subsequently re-delivered the bill to the plaintiff.

 The plaintiff argues for an application of the presumption that a condition shown continues to exist. However, the probability of such an occurrence must be considered in determining whether this presumption shall be applied, and it is held that "where a fact or condition is not continuous in its nature, there is no presumption of its continuance." 22 C.J. 87; 31 C.J.S., Evidence, § 124. See 22 Am. & Eng. Encyc. of Law 1238 (2d Ed.). It is also held

that this presumption is one of fact and is rebutted by evidence which is inconsistent with it. Moore v. Wooten, Tex.Com.App., 280 S.W. 742 at page 747; Martinez v. Gutierrez, Tex.Com.App., 66 S.W.2d 678, at page 684; Commercial Credit Corporation v. Smith, 143 Tex. 612 at page 617, 187 S.W.2d 363. Under the findings and Mr. Newsome's testimony, one would expect that the purchaser rather then the seller, would have the bill of lading; and as a consequence, the presumption contended for by plaintiff would not be applicable because it would have been rebutted.

These comments dispose of one of the alternative grounds which plaintiff was bound to prove in order to show that plaintiff had the right to maintain the suit. We may now consider the other ground, namely, whether a preponderance of the evidence shows that plaintiff, if not the holder of the bill of lading, was nevertheless *entitled to recover* on the bill. We have concluded that it does not.

Plaintiff argues that the facts proved were enough to show that the plaintiff was the promisee of defendant's promise to carry and deliver the goods and therefore had a right to sue on the contract of affreightment, for injury to the goods during carriage, under the rule of decision stated in Missouri Pacific R. R. Co. v. Smith, 84 Tex. 348; 19 S.W. 509, and that plaintiff did not have to prove ownership of the goods. The decision cited was followed in Southern Kansas Ry. Co. v. Morris, 100 Tex. 611; 102 S.W. 396, and in Davis v. Wylie & Jackson, Tex. Com.App., 256 S.W. 256. It was held in these decisions that since the consignor was an obligee of the carrier's promise to carry and deliver the goods, the consignor could recover damages from the carrier for injury done to the goods during carriage, even though title to the goods was vested in another person. In our original opinion, we referred to the holding in Richardson v. D. S. Cage Co., 113 Tex. 152, 252 S.W. 747, that the consignor would be denied the right to enforce the carrier's promise to him if the owner of the goods did not consent to the consignor's suit; but we have concluded that the pur-

chaser of the bottle caps has at least acquiesced in plaintiff's bringing this suit and that this decision is not applicable to this case.

 It has been held that a transfer of the bill of lading by the consignor did not operate as an assignment of his interest in the contract of affreightment and would not divest him of his right to sue upon that contract. St. Louis & S. W. Ry. Co. v. Brass, Tex.Civ.App., 133 S.W. 1075; 10 C.J. 202 § 266; 13 C.J.S., Carriers, § 128. It is to be noted that the decision in St. Louis & S. W. Ry. Co. v. Brass was made before the Federal Bills of Lading Act, 49 U.S.C.A. § 81 et seq., was enacted and that the opinion of the Court of Civil Appeals does not refer to the Carmack Amendment. Furthermore, in the notes to the cited section of Corpus Juris reference is made to English decisions and to decisions of U. S. courts which hold that under various statutes the indorsee or the transferee of the bill of lading can maintain an action on the bill in his own name.

Plaintiff also argues here for the application of a presumption that since plaintiff was shown to be at one time an obligee of the carrier's promise, the plaintiff continued so to be. Under the facts before us, such a presumption would be only a specific application of the presumption that a condition shown continues to exist, and it is subject to the limitations which we have already mentioned as attaching to the more general presumption.

It may be assumed, without any holding one way or the other, that either under the rule of decision or under the presumption contended for by plaintiff, the evidence that defendant issued a bill of lading to the plaintiff for the bottle caps was prima facie proof that plaintiff had the right to maintain this suit, and that defendant was put to the burden of adducing some rebutting testimony.

Nevertheless, since it cannot be inferred that the plaintiff continued to be a lawful holder of the bill of lading, neither can it be inferred that the plaintiff remained an obligee of defendant's promise to carry and deliver the goods. For the rights of the parties to the contract of affreight-

ment are governed by the Federal Bills of Lading Act, and under this statute a delivery of the bill of lading to the plaintiff purchaser may have divested the plaintiff of any interest in the contract of affreightment and, indeed, under the circumstances, it seems more probable that this occurred than that it did not. The situation is simply this: the plaintiff was bound to adduce a preponderance of the evidence showing that plaintiff had a right to recover on the bill of lading, and we think that the evidence ought either to be construed as showing that plaintiff probably did not have such a right, or else that it ought to be construed as failing to show whether the plaintiff did or did not, and that plaintiff accordingly failed to sustain the burden of proof.

There is a distinction between title to the bill of lading and title to the goods. See Geo. F. Hinrichs, Inc., v. Standard Trust & Savings Bank, 2 Cir., 279 F. 382. And if it be inferred that the bill of lading, having been delivered to plaintiff, was subsequently delivered to the purchaser of the goods which were mentioned in the bill, then this inference probably should mean that the title to the bill accompanied the bill itself. Normally this would be in accord with the purchaser's interest and thus, with the seller's duty. See the inferences drawn in Shea v. Minneapolis, St. Paul & S. S. M. Ry. Co., 63 Minn. 228, 65 N.W. 458, and in American Ry. Express Co. v. Ready, 232 Mich. 624, 206 N.W. 344. Under the Federal Bills of Lading Act, such a transfer of title to the bill might divest the consignor of any interest in the contract of affreightment. Sec. 29 of the Act, Sec. 109, Title 49 U.S.C.A., provides: "A bill may be transferred by the holder by delivery, accompanied with an agreement, expressed or implied, to transfer the title to the bill or to the goods represented thereby." This section applies at least to straight bills of lading, and it is provided in Sec. 32 of the Act, Sec. 112, Title 49 U.S.C.A., that: "A person to whom a bill has been transferred, but not negotiated, acquires thereby as against the transferor the title to the goods, subject to the terms of any agreement with the transferor. If the bill is a straight bill such person

also acquires the right to notify the carrier of the transfer to him of such bill and thereby to become the direct obligee of whatever obligations the carrier owed to the transferor of the bill immediately before the notification." Obviously, the transfer mentioned in these two sections would include a transfer by the consignor to the consignee; and such a transfer, if the bill were a straight bill, would be accompanied by a transfer of the consignor's interest in the contract of affreightment.

Exactly the same result would occur if the bill were an order bill of lading and were duly negotiated by the plaintiff to the purchaser of the bottle caps. Section 31 of the Act, Sec. 111, Title 49, U.S.C.A., provides: "A person to whom an order bill has been duly negotiated acquires thereby—

\* \* \* \* \* \*

"(b) The direct obligation of the carrier to hold possession of the goods for him according to the terms of the bill as fully as if the carrier had contracted directly with him."

■ These consequences of the transfer of a bill of lading are inconsistent with the former rule of decision stated above, namely, that a transfer of a bill of lading would not divest the consignor of his interest in the contract of affreightment and thus at least amount to limitations upon this rule, and to the same extent, would be limitations upon the presumption contended for by the plaintiff. Whether the bill was dealt with in the manner referred to in the quoted sections of the Federal Bills of Lading Act was not clearly shown, although Mr. Newsome's testimony and his conduct strongly suggest that it was; but under the facts it seems to us at least as likely that the bill was dealt with in this way as that it was not. We therefore conclude, as we have already stated, that under the evidence it was either more probable that plaintiff's interest in the contract of affreightment was transferred to the purchaser of the bottle caps than that it was not, or else that the evidence leaves it completely uncertain as to whether this did or did not happen and that plaintiff accordingly failed to meet the burden of proof.

These comments adjudicate Point One. Defendant's other Points of Error are overruled.

■ Point Two assigns as error that the evidence "does not show that the bottle caps themselves as distinguished from the containers were in a sound and undamaged condition at the time they were delivered to the defendant at Chicago for shipment." Point Three assigns as error that testimony "that the bottle caps were in perfect condition at the time of delivery to (defendant) at Chicago for shipment was necessarily hearsay—as such witnesses admitted that they did not see the bottle caps as they were manufactured, did not inspect them after manufacture, nor did they pack them in the shipping containers." No person could identify the 4,100 gross of bottle caps referred to in the trial court's findings and thus no one could describe the condition of these caps when they were manufactured, when they were put into the containers, and when they were delivered to the defendant. The condition of the caps when they were delivered to the defendant had to be proved, in all probability, by circumstantial evidence, and the plaintiff made such proof. There is testimony from the plaintiff's sales manager, which appears to be competent evidence, that the plaintiff had stopped re-working old bottle caps "back in December, 1945, promptly upon de-control of steel plate," and the evidence shows that the bottle caps involved in this suit were delivered to the defendant on April 2, 1947, at least 15 months after the date mentioned by the witness. The sales manager also testified, and the trial court was authorized to find that this testimony was not hearsay, that the plaintiff had nothing but new bottle caps in the plaintiff's plant and that the caps which were involved in this suit were made from new steel plate. There was some supporting testimony from the plaintiff's shipping clerk Niehoff, and Niehoff's testimony shows the existence of a system of inspection for determining the condition of the caps as these caps came off a conveyor belt and were packed in

properly lined containers. Mr. Newsome testified that he had bought caps from the plaintiff during a period of 30 years, both before and after he purchased the caps involved in this suit, and that these caps were the only damaged ones which he had ever received. This is strong evidence that the bottle caps were made of good material and were packed, and were shipped under proper conditions, and that the system of inspection shown by Niehoff's testimony was efficient.

Point Four assigns as error that "the evidence was wholly insufficient to show that the 4100 gross bottle caps were in a bad condition and unfit for use at the time of delivery to Lufkin Coca Cola Bottling Company, consignee, at Lufkin, Texas. The evidence shows that only one, two, three, or four of the containers were opened and the bottle caps found to be damaged and unfit for use, after which all of the rest of the shipment was dumped and destroyed, without any evidence being adduced as to their condition, so that appellee did not discharge the burden of proof resting upon it of showing the extent of the loss or injury to support the amount of the judgment in the sum of $717.50 as the value of 4100 gross of the bottle caps involved in the shipment." There was evidence which supported the trial court's finding. Thus Mr. Newsome testified to opening one and possibly other barrels of caps and to his conclusion not to use any of the shipment. He obviously believed that the entire shipment was unfit for use and the subsequent conduct of the interested parties tends to show that this conclusion was right. Thus Mr. Newsome notified the plaintiff's salesman of the conditions he had found, and this man and the foreman of Mr. Newsome's plant went through the shipment and examined it and afterwards Mr. Newsome "dumped" the shipment. Subsequently, plaintiff brought this suit. The implication is strong that the caps were examined and were found to be unfit by a representative of the seller and a representative of the purchaser. There is some evidence that the caps were subjected to the same conditions during shipment. Thus the shipment was not large, being contained in 50 barrels or in 41 barrels; it was delivered to the carrier at one time; and it was delivered by the carrier to the purchaser at one time, for one delivery receipt. Mr. Newsome tesified that the steel hoops around the barrels were beginning to rust when the barrels were delivered to him and the trial court could infer that this testimony applied generally to the entire shipment. It is held that a fair number of samples taken from goods of the same sort, contained in barrels, subjected to the same conditions during transportation, is evidence of the condition of all of the goods. Dunlap v. Great Northern R. R. Co., 34 S.D. 320, 148 N.W. 529. This rule is applicable.

These comments adjudicate all of the Points of Error. As heretofore determined, the judgment of the trial court is reversed and the cause remanded. The plaintiff's motion for rehearing is overruled.